# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

LORI D. RANDOLPH,                           )
                                            )
    Plaintiff,                          )
                                            )
v.                                          )          Case No. 1:12-CV-217 SNLJ-NAB
                                            )
CAROLYN W. COLVIN[1],                       )
Acting Commissioner of Social Security,     )
                                            )
    Defendant.                          )

## MEMORANDUM AND ORDER

      This is an action under Title 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision denying Lori D. Randolph's (Randolph) application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. (Tr. 198-202.) Randolph alleged disability due to cirrhosis of the liver, headaches, neck pain, rape, numbness on the left side, recovering alcoholism, dizziness, poor eyesight, forgetfulness, heart murmur, arthritis, anxiety, and chronic bronchitis. (Tr. 242.) This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) for a report and recommendation. [Doc. 6.]

## I.    Procedural History

      On March 2, 2010, Randolph filed an application for SSI. (Tr. 198-202.) The Social Security Administration ("SSA") denied Randolph's claim and she filed a timely request for a

---

[1] At the time this case was filed, Michael J. Astrue was the Commissioner of Social Security. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the Court may order substitution at any time. *Id.* The Court will order the Clerk of Court to substitute Carolyn W. Colvin for Michael J. Astrue in this matter.

hearing before an administrative law judge ("ALJ"). (Tr. 94-98, 99.) A hearing was held on June 7, 2011. (Tr. 41-74.) After a hearing, the ALJ issued a favorable decision on June 30, 2011. (Tr. 77-86.) On September 19, 2011, the Appeals Council reviewed the decision of the ALJ pursuant to 20 CFR § 416.1469 and remanded the case to the ALJ to obtain additional evidence regarding Randolph's impairments from her treating sources, a medical expert, a vocational expert, and to further evaluate the RFC credibility determinations. (Tr. 87-91.)

A second administrative hearing was held on February 9, 2012. (Tr. 24-40.) After the second administrative hearing, the ALJ issued a decision denying benefits on April 2, 2012. (Tr. 8-16.) Randolph requested review of the ALJ's unfavorable decision from the Appeals Council. (Tr. 4.) On November 28, 2012, the Appeals Council denied Randolph's request for review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000). Randolph filed this appeal on December 28, 2012. [Doc. 1.] The Commissioner filed an Answer and the certified Administrative Transcript on March 11, 2013. [Docs. 11, 12.] Randolph filed a Brief in Support of Complaint on May 10, 2013. [Doc. 16.] The Commissioner filed a Brief in Support of the Answer. [Doc. 21.]

## II.    Standard of Review

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A).

The Social Security Administration uses a five-step analysis to determine whether a claimant seeking disability benefits is in fact disabled. 20 C.F.R. § 416.920(a). First, the claimant must not be engaged in substantial gainful activity. 20 C.F.R. § 416.920(a). Second,

the claimant must establish that he or she has an impairment or combination of impairments that significantly limits his or her ability to perform basic work activities. 20 C.F.R. § 416.920(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the appendix to the applicable regulations. 20 C.F.R. § 416.920(d).

Fourth, the claimant must establish that the impairment prevents him or her from doing past relevant work. 20 C.F.R. § 416.920(f). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity to perform a significant number of jobs in the national economy. *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. § 416920(a)(4)(v).

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is less than preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Therefore, even if this court finds that there is a preponderance of evidence against the weight of the ALJ's decision, the decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion. *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## III.    Decision of the ALJ

The ALJ determined that Randolph has not engaged in substantial gainful activity since February 28, 2010, the alleged onset date of disability (Tr. 15.)  The ALJ found that Randolph had esophagitis and other gastrointestinal impairments, inactive hepatitis C, and diagnosis of anxiety, depression and post-traumatic stress disorder ("PTSD").  *Id.*  The ALJ also found that Randolph does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ determined that Randolph had the residual functional capacity ("RFC") to perform work with the following limitations:  no lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally; cannot perform more than simple, routine, repetitive tasks; and no close or frequent contact with co-workers, supervisors, or the general public.  *Id.*  He also determined that Randolph could perform her past relevant work as a dishwasher, because the work does not require the performance of work-related activities precluded by the RFC determination.  *Id.*  Finally, the ALJ concluded that Randolph has not been under a disability, as defined in the Social Security Act from February 28, 2010, through the date of the decision.  *Id.*

## IV.     Administrative Record

The following is a summary of relevant evidence before the ALJ:

## A.     Hearing Testimony

At each of the administrative hearings, the ALJs[2] heard testimony from Randolph and Brenda Young, the vocational expert ("VE").   Randolph was represented by counsel at both hearings.

## 1.     Randolph's Testimony

Randolph testified that she was forty-nine years old at the time of the initial hearing.  (Tr. 47).   Randolph completed the ninth grade and eventually received her general education diploma.  (Tr. 49.)  She has not received any other certification or specialized training.  (Tr. 49.)

Randolph stated she last worked in August of 2010 as a cleaning lady one or two days per week.  (Tr. 49-50.)  In that job she cleaned bathrooms and lifted approximately ten pounds.  (Tr. 50.)  She testified that her job ended because she could not remember anything, became lost in the building, and walked into walls.  (Tr. 28, 50.)  Before the cleaning job, Randolph worked as a salvage yard worker.  (Tr. 51.)  She also previously worked as a dishwasher full time.  (Tr. 52.)  Her job as a dishwasher ended, because she dislocated her arm after hitting it on a concrete wall and her employer fired her.  (Tr. 28.)

Randolph testified that the most severe medical condition preventing her from work is the problem with her lower back and legs.  (Tr. 27, 54.)  In 1992, Randolph had back surgery to remove herniated disks.  (Tr. 54.)  She rates her pain as an eight on a scale of one to ten.  (Tr. 29.)  Randolph testified that she still has pain in the middle of her back.  (Tr. 55.)  Randolph does

---

[2] Administrative Law Judge James B. Griffith presided over the first administrative hearing on June 7, 2011. Administrative Law Judge Thomas C. Muldoon presided at the second administrative hearing on February 12, 2012.

x

x

not take any pain medication. (Tr. 29-30, 67.) Randolph also states that she has a crooked spine. (Tr. 54.) Randolph has pain in her shoulders on a regular basis. (Tr. 55.) Randolph stated that she has tingling and numbness at the bottom of her feet as well. (Tr. 55.)

Randolph testified that she has chronic bronchitis and uses two inhalers to treat the condition twice daily. (Tr. 55.) Randolph testified that she also has hepatitis C, which causes her to become tired and fatigued. (Tr. 55-56.) Randolph stated that she also has vision problems. (Tr. 56.)

Ramsey testified that she is also treated for mental health issues. (Tr. 56.) She takes Seroquel and ten other medications including Topamax and Celexa to treat her mental condition. (Tr. 57.) She received treatment from her primary care physician Dr. Henry Steele and most recently Dr. James Weber for her mental health care. (Tr. 56-57.) She stated that she becomes dizzy, cannot squat, cannot get up, and has memory lapses because of her mental issues. (Tr. 58-59.) She also testified that she has trouble sleeping and has flashbacks to moments in her past that last ten to twenty minutes. (Tr. 59.) She testified that she has anxiety attacks that happen once or twice a week. (Tr. 59-61.) Randolph testified that she does not go anywhere. (Tr. 61.) She stated that she does not like being around people and when visitors come to her home she goes to her room and watches television. (Tr. 33, 62.) She feels that people judge her so she avoids them. (Tr. 62.) In 2010, she was hospitalized for mental health treatment for nine days. (Tr. 62-63.) She testified that she did not have suicidal thoughts at the time of the hearing. (Tr. 63.) She also has problems with short term memory. (Tr. 34.)

Randolph testified that she can only stand in one spot for about twenty to thirty minutes at a time. (Tr. 63.) She testified that she can walk twenty minutes before her knees and hips begin to hurt. (Tr. 30-31.) She also stated that she cannot sit in one spot for more than forty-

five minutes. (Tr. 64.) Randolph can lift fifteen pounds. (Tr. 64.) Randolph goes grocery shopping twice per week. (Tr. 64-65.) She can drive and shop alone, but she usually takes her husband with her. (Tr. 65.) Randolph does not go into the store, because she does not like being around people. (Tr. 37-38, 61-62.) She only showers twice a week, because she does not feel like getting dressed. (Tr. 66.) Randolph could wash dishes and vacuum without problems at the time of the first hearing, but at the time of the second hearing she testified that standing up and washing dishes aggravates her back after ten minutes. (Tr. 30, 65.) Randolph stated that she has problems dressing and that she needs help getting out of the bathtub. (Tr. 31.) She also stated that she has gastroesophageal reflux disease ("GERD") that causes her to lose sleep and have trouble eating. (Tr. 35.) She testified that she gained at least seventy pounds in the past year at the time of the second hearing. (Tr. 35.)

### 2. VE Brenda Young's Testimony

The VE testified that Randolph's cleaning work is classified as light exertional and unskilled. (Tr. 69.) The dishwasher work is classified as medium exertional and unskilled, but she performed it at the light work category. (Tr. 69.) There was not enough information about the salvage yard job to make a determination regarding its exertional or skill levels. (Tr. 70.)

The VE testified that a hypothetical individual who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to six hours total in an eight hour work day with normal breaks; sit for six hours total in an eight hour work day with normal breaks; was limited to work involving understanding, remembering, and following simple instructions and directions; and with no more than occasional contact with others would be able to perform Randolph's past relevant work as a dishwasher and cleaner. (Tr. 70.) The VE also testified, however, that if the additional limitation of only occasional use of the bilateral hands

for gross and fine manipulation was added, Randolph's past relevant work would be eliminated, as well as any other jobs. (Tr. 73.)

Next, the VE testified that a hypothetical individual who could lift up to 20 pounds continuously and fifty pounds occasionally; carry ten pounds continuously, up to 20 pounds frequently, and up to fifty pounds occasionally; sit for only one hour continuously during a workday; stand for a total of four hours in a workday, thirty minutes as a time; walk four hours in a workday, three minutes at a time; occasionally reach overhead, frequently reach in all directions; never engage in handling or feeling, but occasionally engage in fingering and pushing and pulling; never operate foot controls; never climb stairs, ramps, ladders, or scaffolds; never balance; occasionally stoop, kneel, crouch or crawl; never be exposed to unprotected heights, extreme heat, cold, or vibration; occasionally tolerate exposure to moving mechanical parts; operate a motor vehicle; occasionally tolerate humidity and wetness; tolerate noise at a moderate office level; does not require shopping; could not travel without a companion for assistance, could not climb steps at a reasonable pace with the use of a single handrail and could not sort, handle, or use paper or files; can ambulate without an assistive device; can walk a block at a reasonable pace on rough or uneven surfaces; prepare simple meals; and feed and care for personal hygiene would be unable to perform any past relevant work or any other work. (Tr. 70-72.)

### B.    Medical Records

On June 3, 2007, Randolph visited the Parkland Health Center Emergency room for chest tightness and fast heart rate. (Tr. 584-586.)  She was diagnosed with alcoholic hepatitis. (Tr. 585.)  Randolph visited Parkland Health Center's emergency room for anxiety, dizziness, and

weakness on April 20, 2008.  (Tr. 606-608.)  She received a diagnosis of alcohol intoxication.  (Tr. 607.)

On May 17, 2009, Randolph received medical treatment due to a sexual assault.  (Tr. 360-394, 553, 561-571.)  On September 9, 2009, Randolph visited Iron County Hospital seeking treatment for a laceration of the forearm.  (Tr. 316-320.)

Dr. Henry Steele began treating Randolph on September 29, 2009.  (Tr. 341.)  At that time, Randolph complained of headaches, lack of feeling in hands and feet, anxiety attacks, breathing problems, and heart palpitations.  (Tr. 341.)  Dr. Steele ordered a stress test, echocardiogram without contrast, and twenty-four hour Holter Monitor to evaluate Randolph's heart palpitations.  (Tr. 354-358.)  The stress test was normal and the echocardiogram showed decreased left ventricular diastolic function low pressure filling phase, but was otherwise normal.  (Tr. 355-356.)  The holter monitor indicated there was no supraventricular or ventricular ectopy and no abnormal tachycardia or bradycardia.  (Tr. 358.)  A CT scan of her liver in December 2009 showed findings consistent with probable underlying cirrhosis.  (Tr. 555.)  During visits between November 2009 and February 2010, Randolph complained of anxiety attacks.  (Tr. 334-339, 341.)  Dr. Steele stressed the need for Randolph to obtain psychiatric treatment, including recommending voluntary admission at Southeast Missouri Mental Health Center (Tr. 338, 340.)

Randolph was hospitalized at Jefferson Regional Medical Center after complaining of depression and suicidal thoughts in January 2010.  (Tr. 322-325.)  Randolph reported that she had been crying, having nightmares, depressed, sad, down in the dumps, worried, concerned because of the sexual assault, and having panic attacks, which were becoming more severe.  (Tr. 323.)  Dr. Ahmad Ardekani noted that Dr. Steele was contacted and Dr. Steele stated that Randolph needed more help than he could give to her.  (Tr. 323.)  At the time of discharge, Dr.

Ardekani diagnosed Randolph with depression, panic, and anxiety. (Tr. 325.) Dr. Ardekani noted that during her stay Randolph was stabilized on medication and was no longer suicidal. (Tr. 325.)

In February 2010, Randolph complained that her Ativan was not working and she was having ongoing panic attacks. (Tr. 335.) Randolph also reported that the Ambien worked well for her, but she ran out of it. Dr. Steele diagnosed her with hepatitis C and mood disorder. (Tr. 334.) He also noted that she was "pretty blue" and lacked "much, if any insight." (Tr. 334.) On February 25, 2010, Randolph was evaluated by nurse practitioner Christine DeBold at the Hepatology Clinic at Washington University in St. Louis School of Medicine. (Tr. 504-505, 647-649.) She received a diagnosis of chronic hepatitis viral infection ("HCV"), cirrhosis secondary to chronic HCV and alcohol abuse, and increasing constipation and blood with stools. (Tr. 505.)

On March 9, 2010, Randolph visited Dr. Steele and complained of severe headaches, blurred vision, and pain increased by light and sound. (Tr. 426.) Dr. Steele noted that Randolph seemed "less labile." He diagnosed her with insomnia, cephalgia, and somatic dysfunction. (Tr. 425.) On April 20, 2010, Randolph complained of weight gain, but reported that she was sleeping wonderfully, did not "fly off the handle" like she used to, and did not sit around crying anymore. (Tr. 424.) Dr. Steele noted that Randolph was smiling and much brighter. (Tr. 423.)

Randolph visited Dr. Steele monthly between June 2010 and April 2011. Randolph complained about weight gain throughout the time period. (Tr. 468-469, 471, 475-476, 481-484, 488-489.) Psychologically, Randolph reported doing well between June and November 2010. (Tr. 477-478, 481-482, 483-484, 491-492.) In December 2010 and January 2011, Randolph's husband reported Randolph was experiencing auditory hallucinations. (Tr. 470-471, 472-473.)

She also complained of pain in her feet and tremors.  (Tr. 468-469, 475-478, 651-652.)  A nerve conduction study on February 10, 2011 showed left peroneal neuropathy.  (Tr. 572.)

On May 17, 2010, Dr. Mel Moore completed a Physical RFC Assessment regarding Randolph.  (Tr. 431-436.)  Dr. Moore found Randolph had the following external limitations: occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk for a total of six hours in an eight hour workday; sit for a total of about six hours in an eight hour workday; and unlimited pushing and pulling.  (Tr. 432.)  Dr. Moore found no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 432-434.)  He opined that Randolph's allegations were partially credible.  (Tr. 426.)  Dr. Moore's conclusions were based upon a review of Randolph's medical records.

On June 21, 2010, Dr. James Spence completed a Mental RFC Assessment and Psychiatric Review Technique regarding Randolph.  (Tr. 437-451.)  Dr. Spence's conclusions were based upon a review of Randolph's medical records.  Dr. Spence opined that Randolph was moderately limited in the ability to understand, remember, and carry out detailed instructions and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform it at a consistent pace without an unreasonable number and length of work breaks.  (Tr. 437.)  Dr. Spence determined that Randolph had depression and PTSD.  (Tr. 443-444.)  Dr. Spence also found that Randolph was mildly limited in activities in daily living and maintaining social functioning with moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 448.)  He did not note any repeated episodes of decompensation.  (Tr. 448.)

On August 26, 2010, nurse practitioner DeBold examined Randolph as a follow-up regarding her chronic HCV infection.  (Tr. 632-633.)  Dr. DeBold noted that since Randolph's

last visit, laboratory tests showed a complete normalization of her liver enzymes. Dr. DeBold determined that Randolph had chronic HCV infection with good synthetic function and normalized liver enzymes, but noted that a diagnosis of cirrhosis was not clear. (Tr. 633.)

On December 9, 2010, Dr. Steele completed mental and physical medical source statements about Randolph. (Tr. 453-463.) In the mental statement, Dr. Steele found that Randolph had marked limitations in almost every category including understanding, remembering, and carrying out simple instructions; understanding, remembering, and carrying out detailed instructions; making judgments on complex work related decisions; interacting appropriately with supervisors and co-workers; and responding appropriately to work pressures and changes in a usual, routine work setting. (Tr. 453-454.) He found that she had extreme restrictions in interacting appropriately with the public. (Tr. 454.) Dr. Steele determined that she had marked restrictions on activities of daily living and concentration, persistence and pace. (Tr. 454.) He found that she had extreme difficulties in maintaining social functioning. (Tr. 454.) He opined that she had continual episodes of deterioration or decompensation in work or work like settings. (Tr. 454.) Dr. Steele stated that his assessment was supported by Randolph's minimal insight into personal and others' behaviors and auditory hallucinations. (Tr. 454.) Dr. Steele noted that neurological screening showed saccadic[3] eye movement with end point nystagmus[4] and decreased sensation in her hands and feet. He found that her global assessment functioning[5] ("GAF") score was 40, which indicates major impairment in several areas such as work or school, family relations, judgment, thinking or mood. (Tr. 455.); DSM-IV-TR at 34.

[3] Saccadic means "jerky." Stedman's Medical Dictionary 1586 (27th ed. 2000).
[4] Nystagmus is "involuntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component." Stedman's Medical Dictionary 1246 (27th ed. 2000).
[5] Global Assessment Functioning score is a "clinician's judgment of the individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").

In the physical statement, Dr. Steele opined that Randolph can lift up to twenty pounds continuously, twenty one to fifty pounds occasionally, and never lift over 50 pounds. (Tr. 457.) He also determined that she could carry up to ten pounds continuously, eleven to twenty pounds frequently, twenty-one to fifty pounds occasionally, and never carry over fifty pounds. (Tr. 457.) He opined that Randolph can sit for sixty minutes, stand for thirty minutes, and walk for three minutes without interruption. (Tr. 458.) He also opined that she can sit for sixty minutes, stand for four hours, and walk for four hours total in an eight hour work day. (Tr. 458.) Dr. Steele determined that Randolph could occasionally reach overhead with both hands and frequently reach and finger, push, and pull with both hands occasionally. (Tr. 459.) He determined that she could never handle or feel with either hand, or operate foot controls with either foot. (Tr. 459.) Dr. Steele found that she could occasionally stoop, kneel, crouch, and crawl, but never balance or climb stairs, ramps, ladders, or scaffolds. (Tr. 460.) He also found that Randolph could not be exposed to unprotected heights, extreme cold or heat, or vibrations; but she could occasionally be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, and dust, odors, fumes, and pulmonary irritants. (Tr. 461.) He noted that she could tolerate a moderate office noise level. (Tr. 461.) Dr. Steele determined that she could not shop, sort, handle, or use paper files, and could not climb a few steps at a reasonable pace with the use of single hand rail. (Tr. 462.) He stated that these findings were supported by Randolph's generalized weakness and decreased sensation in her hands and feet. (Tr. 457, 460, 462.) Dr. Steele stated that Randolph "suffers auditory hallucinations which make her unsafe in a work environment." (Tr. 462.)

Randolph received treatment and evaluation for restless legs and shooting, burning pain in her lower extremities in December 2010. (Tr. 465.) A nerve conduction study showed left peroneal neuropathy. (Tr. 466.)

On February 22, 2011, Randolph had a total colonoscopy and ileoscopy with biopsy and Brinkerhoff anoscopy. (Tr. 532-534, 575-581.) Her post-operative diagnosis was modest diverticular disease of the upper significant and distal descending colon, edematous-appearing terminal mucosa, and grade 2 ¾ internal hemorrhoids. (Tr. 579.)

On May 17, 2011 Dr. Patrick Oruwari examined Randolph and completed a Medical Report to the Missouri Department of Social Services. (Tr. 668-669.) He opined that she had major depressive disorder in remission and PTSD. (Tr. 669.) He also opined that her mental disability prevented her from engaging in employment and that the duration of her disability or incapacity would be between six and twelve months. (Tr. 669.) Dr. Oruwari determined that Randolph's GAF score was 57 indicating serious impairment in social and occupational functioning. (Tr. 671), DSM-IV-TR at 34.

In a medical source statement dated May 23, 2011, Dr. Oruwari, opined that Randolph was moderately impaired in interacting appropriately with the public, supervisors, and co-workers and responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 665.) He stated that her avoidant behavior and enhanced social anxiety relates to her sexual trauma. (Tr. 665.)

On May 19, 2011, Randolph began treatment with Dr. James Weber. (Tr. 674.) At the initial encounter, Dr. Weber determined that Randolph had major depression, PTSD, hyperthyroidism, and chronic obstructive pulmonary disease ("COPD"). (Tr. 674.) In a letter dated September 26, 2011, Dr. Weber stated that Randolph suffered from major depression, anxiety, and PTSD and concluded that she could not hold any type of job. (Tr. 686.) On November 1, 2011 Dr. Weber performed proton pump inhibitor therapy on Randolph. (Tr. 700.) The test revealed reflux and distal esophagitis, antral gastrisis, and mild duodentis. (Tr. 700.)

On September 23, 2011, Dr. Weber completed a Medical Source Statement regarding Randolph.  (Tr. 680-684.)  Dr. Weber diagnosed Randolph with major anxiety, depression, COPD, insomnia, hypothyroidism, and bipolar disorder.  (Tr. 680.)  He opined that she was severely limited in the ability to deal with work stress.  (Tr. 681.)  He determined that she could continuously sit for less than fifteen minutes and needed less than fifteen minutes to stand or walk about before returning to a seated position.  He also stated that Randolph could sit for less than one hour total during an eight hour workday.  He found that she could continuously stand or walk for three hours continuously maximum and she would need to sit or lie down/recline for more than three hours after standing or walking for three hours.  (Tr. 682.)  Dr. Weber also opined that she could lift and carry up to five pounds frequently and up to ten pounds occasionally, but never more than ten pounds.  (Tr. 683.)  He found that her neck could occasionally flex backward and forward and occasionally rotate left or right.  (Tr. 683.)  He also found that she could occasionally reach with her right and left hands in any direction and handle with both hands occasionally.  (Tr. 683.) Dr. Weber stated that her impairments produce good days and bad days and that she was likely to be absent more than 3 times per month due to her impairments.  (Tr. 684.)  On September 26, 2011, Dr. Weber authored a letter stating that Randolph suffers from major depression, anxiety, and PTSD and multiple medical problems.  (Tr. 686.)  Dr. Weber opined that due to her illnesses, she is unable to hold any type of job including filing.  (Tr. 686.)

On November 2, 2011, Randolph's pastor Joseph M. Lawson prepared a letter stating that Randolph has major problems and seems to fear being with other people and will hardly open her door to anyone.  (Tr. 688.)  Pastor Lawson stated that she is "almost afraid of communicating

with others." He stated that it is his "feeling" that "she is not able nor capable of holding a job." (Tr. 688.)

## V.  Discussion

Randolph presents three errors on review. First, Randolph asserts that the ALJ failed to properly consider opinion evidence in the record. Second Randolph asserts that the ALJ failed to properly consider her credibility. Third, Randolph contends that the Commissioner failed to consider her for disability insurance benefits.

### A.  Opinion Evidence

Randolph contends that the ALJ failed to explain the weight given to the medical opinions in the record, improperly gave greater weight to the medical consultants than to her treating physicians, and failed to give controlling weight to her treating physicians.

In making a disability determination, the ALJ shall "always consider the medical opinions in the case record together with the rest of the relevant evidence in the record." 20 C.F.R. § 416.927(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 416.927(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.* "[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

"Unless, a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist or other medical specialist." 20 C.F.R. § 416.927(e)(2)(ii). The Eighth Circuit has held that if medical opinions are consistent, the ALJ need not weigh them. *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (because the doctor's reports were consistent with regards to the determinative factors, the ALJ did not err in identifying the weight he gave to each medical opinion).

In this case, the ALJ did not identify any weight given to any of the opinions in the record. The ALJ's decision states "there is no credible medical basis for all of the postural limitations cited by Dr. Steele or Dr. Weber." (Tr. 13.) The ALJ determined that "the actual clinical records from Dr. Steele and Dr. Weber do not indicate limitations (in basic abilities to

think, understand, communicate, concentrate, get along with other people, make normal judgments and decisions, adjust to routine work setting changes, and handle normal work stress) exist on a constant ongoing basis. (Tr. 14.). The ALJ stated that Dr. Oruwari, the only psychiatrist that examined Randolph, did not impose any mental limitations beyond those contained in the RFC and noted that Dr. Steele and Dr. Weber were not psychiatrists. (Tr. 13.) Finally, the ALJ stated that the RFC determination was consistent with the findings of the state agency medical consultants, Dr. Moore and Dr. Spence. (Tr. 12.)

Although the ALJ's decision does not explicitly label the weight given to the medical opinions, it is clear from the decision that the ALJ gave greater weight to the opinions of Dr. Oruwari, a consulting physician for Missouri Medicaid and Dr. Moore and Dr. Spence, non-examining medical consultants over the opinions of Randolph's treating physicians, Dr. Steele and Dr. Weber. Regarding Randolph's mental impairments, the ALJ could give more weight to Dr. Oruwari's opinion regarding Randolph's mental health than Dr. Steele and Dr. Weber. "Greater weight is generally given to the opinion of a specialist about medical issues in the area of specialty, than to the opinion of a non-specialist." *Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010); 20 C.F.R. § 416.927(c)(5). Dr. Steele even admitted that Randolph needed more help than he could give her and advised her to seek psychiatric treatment including voluntary admission at a local mental health facility. (Tr. 323, 338, 340.) Randolph did not receive any treatment from a mental health professional outside of her hospital stay in January 2010, despite allegations of disabling mental health symptoms. Regarding Randolph's physical limitations, the undersigned finds that the ALJ properly concluded that there was no objective medical evidence to support the extreme limited physical limitations given by Dr. Weber and Dr. Steele. Based on

a review of the entire administrative record, the undersigned finds that the ALJ properly considered the medical opinion evidence in this case.

### B. Credibility Determination

Next, Randolph asserts that the ALJ's credibility determination was not based on substantial evidence. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). "It is not enough that the record contains inconsistencies; the ALJ must

specifically demonstrate that he considered all of the evidence." *Id.* The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988).

The undersigned finds that the ALJ's credibility assessment is supported by substantial evidence in the record as a whole. The ALJ could properly consider Randolph's low earnings record, lack of treatment from a mental health professional, and inconsistencies between her subjective complaints and the objective medical evidence. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ can disbelieve subjective complaints if there are inconsistencies in the evidence as a whole and lack of corroborating evidence is just one of the factors the ALJ considers); *Fredickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (claimant's credibility lessened when considering sporadic work record reflecting relatively low earnings and multiple years with no reported earnings); *Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (lack of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in mental capabilities disfavor a disability finding).

### C. Title II Disability Benefits

Finally, Randolph requests that the Court order the Commissioner to determine her eligibility for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423. The undersigned recommends that the Court deny Randolph's request as this issue is not properly before the Court. If Randolph seeks a determination of eligibility for disability insurance benefits, she must apply through the SSA application process.

**VI.     Conclusion**

For reasons set forth above, the undersigned recommends that the Commissioner's decision be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief which Randolph seeks in her Complaint and Brief in Support of plaintiff's Complaint be **DENIED**.  [Doc. 1, 15.]

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *See Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 14th day of January, 2014.

      /s/ Nannette A. Baker           .
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE